Part 2. So, given my earlier admonition, we've really plowed the fields in terms of, you know, the landscape and on and on and on. So it'd be helpful to the panel if you'd sort of hone in then on where this narrows into the second appeal, which is different. But obviously it's the same regulations and so on and so forth. But where there are variations and the fact pattern notices, et cetera, then help us with that. All right, Mr. Roth. May it continue to please the Court? So I'm here now representing four other providers who were located in the Abilene, Texas, wage area for Medicare payment purposes. So when the wage index came in for Abilene too low, not only did it affect Hendrick, but it affected these other four providers as well. In this instance, it's actually somewhat different because Hendrick Medical Center was dismissed for lack of jurisdiction for failure to exhaust its administrative remedies. That's not the case with the Anson providers. The Anson providers did not have a process that it needed to exhaust because that process applies when a hospital is trying to correct its own wage data. These four providers, their wage data was correct. What happened was they were prejudiced. They were affected detrimentally by the Secretary's use of the incorrect wage data for Hendrick Medical Center. So just to be clear, the providers are not here asking for the wage index to be changed. They're not. They're not asking to correct Hendrick Medical Center's wage data. They're not. The Secretary already has that correct data. What the providers are seeking here is to be paid based on the evidence the substantial evidence that is in the record of this case. And here the undisputed record of the case is that the Hendrick's data was incorrect, but the correct information was in the record. So what the other providers are seeking, they have an absolute statutory right to get this corrected, as we saw in Saratoga and those other cases. They've exercised that right. They went to the administrative process. The result of the administrative process was that, look, we can't grant you the relief. You're going to have to go to court to get that relief. And so following that statutory right, these hospitals are asking to be paid in accordance with the correct facts that are in the record. So the Secretary argues, makes a series of arguments. The first one is that there's no relief because of this incorrect wage index and budget neutrality, retroactivity, all of these issues. But as we discussed and as the Secretary stipulated in that Saratoga case, that there in fact can be corrections that are made to providers who are prejudiced by an incorrectly low wage index. And a wage index doesn't have to be recalculated. What has to be done is calculate how much would have been paid if the correct wage index had been used and then make that payment to the providers. No case, no case has ever held that hospitals under these circumstances are not entitled to relief. The Secretary mentions the regulation 412.64. 412.64 doesn't apply to providers. That's the Secretary saying that here's the relief I can grant. And Judge Higginbotham, you had asked about discretion. The Secretary not only has full discretion to correct these payments, the Secretary even adopted a notice and comment rulemaking saying how he would exercise that discretion under one particular circumstances, never suggesting for a moment that the Secretary couldn't exercise discretion under other circumstances as well. The Secretary also argues here that there's no relief because one hospital cannot challenge another hospital's wage data. You see, and we believe that that's a red herring because we're not challenging Hendrick's wage data. We're challenging the Secretary for relying on incorrect wage data. The Secretary has Hendrick's wage data. They don't need these providers to correct it. The Secretary knows what the correct wage data is and that payment should be made in accordance with the correct data. The Secretary then argues that the wage data is not required to be perfect. Of course, we didn't make that argument, but the Secretary goes on to admit that the Secretary is required to use the best available data. Well, here there's no question. Does the requirement that this exercise be budget neutral affect your argument? I don't think the budget, what the Secretary is required by statute when it adopts that final rule containing the wage index, that thing has to be budget neutral. And so from the proposed rule to the final rule, if one wage area goes up, another wage area has to come down to make that budget neutral. That is under, and I'm sorry to be so technical, but that's under the prospective payment system statute. There's a separate statute that gives hospitals the right to get paid properly by Medicare. And that statutory right is not limited. There's nothing in the prospective payment statute that limits the absolute right of hospitals to be paid correctly. And that's the nature of it. So we don't believe that it affects, as in like Saratoga, for example. And I guess the question comes to my mind is how does the, how do you, how do you continue, you don't correct the, there's no correction of the underlying error here. And, but yet you, you, you, you, you, you just, the hospitals have an entitlement that, um, they, the consequences of the error are not visited on the hospitals themselves. They are almost a direct claim, uh, independent of the administrative process. Well, the, the way that this, because this is set prospectively, Your Honor, things happen, right? So for example, you could have the rate setting scheduled for fiscal year 2021 that starts 10-1-21 and then a hospital closes on 10-1. So there's been money allocated to that. It's not going to go. On the other hand, there could be a hospital that opens on 10-1 and they have, well, what do we do here? They're entitled to it. So the fact that there were kind of adjustments after the fact, especially in Anson, the four providers, the, the total is $650,000 out of, like I said, $110 billion program. So these kinds of fine tunings, these kinds of exceptions that happen after the fact have been, have been recognized. Now they talk about, you know, the, the counsel of the secretary talked about that Bay State Franklin case, and that's an interesting case because it was $119 million at stake, and that's getting to be a significant sum of money. But, but number one, I don't believe there's any case law that says there has to be a revisit to the wage index. But in that case, they were claiming the wage index was wrong because the policies were wrong. Here, the wage index was wrong because the secretary used knowingly incorrect information when the secretary had the correct information. That's the distinguishing factor for the, for this case. The, the secretary also argues that somehow the Hendrick Medical Center's, you know, lack of review of the May 2nd wage data prevents the Anson providers from getting, from getting relief. But that's not true because under the APA, the, the question for this court is whether the payments that, in this court, it has jurisdiction, there's no question about its jurisdiction. The question under the APA is, was this arbitrary and capricious, these payments arbitrary and capricious, not based on substantial evidence? Well, the secretary has conceded it wasn't based on substantial evidence because the evidence in the record is that the, the, the, the wage that we used for Hendrick Medical Center was incorrect. It also wasn't based on the best available data because the available data at the time that the secretary prepared that wage index, they had the correct, the secretary had the correct data. Again, didn't provide a whole lot of background or explanation for its decision, but the, the, the, the lower court held that the providers are seeking belatedly to correct Hendrick's data, but we don't think that's what's going on here. And, and because it, it, the, the problem here is that, is that the hospital providers here are not trying to correct the data. The secretary already has the data. And so the district court's reliance on the wage data correction process we believe is improper under these circumstances because Hendrick had already used that process to make sure that the correct data was in the record for the secretary to, to use. And then the, the, the court went on to hold that the secretary's calculations were supported by substantial evidence. And, and we believe that that is that the record of the case shows that the substantial evidence that's in the record, in fact, the only evidence that's in the record is the information that was, that the parties agreed to back in March before any of these, before the contractor made it, made its, its unilateral error. The, the, the lower court cited one case, the Anna Jack's case. And the Anna Jack's case was, it was an interesting case, a DC circuit decision. But in that case, what you had were you had a group of hospitals that were challenging the boundaries that the secretary used to identify and identify the wage areas. And the, and the court was concerned in that case that the, that the wage area was, that that was a matter of, of secretarial discretion. And, and, and, and our view is that the Anna Jack's case does not in any way, first of all, it doesn't address the wage data correction process at all. Second of all, it doesn't address unilateral MAC error. And third of all, it doesn't address the APA question about a payment not being consistent with the substantial evidence of the record. And that's why we, we refer the court. The court is now in the Bay State Franklin case that the DC circuit is grappling with itself. It will, it has to deal with this, this question of what happens when payments are made based on incorrect information. So I know I have a few more moments, your honors, but if there are no questions for me at this time, I will just go to Tammy Parker. May it please the court. My name is Tammy Parker and I represent the secretary and the second set of appeals involving the Anson providers. Conspicuously missing from both the briefs and from counsel's argument here before this court is the question of what deference is owed to the secretary in administering what every court from the district court to the Supreme Court. And what this court here today has noted is an elaborate program that is very complex. It's very regulated. It involves a lot of data and a lot of information and courts is from the district court to the Supreme Court have noted that the secretary has afforded a broad discretion and administering a program in so far as Congress did not directly speak on the precise issue that is at issue in the case. And in this case, there is no question that Congress did not speak on the precise issue of how the secretary was to conduct a survey to obtain the information used to calculate the wage index. In this case, what Congress told the secretary was to collect this survey and to use a factor to reflect the relative hospital wage levels and to do that annually. There was no further guidance provided by Congress. Therefore, the secretary had discretion in creating a system that allowed the secretary to carry out the mandates of administering a program of this size. What information is made available to the providers in this particular area or any area once the data is published, that these are the rates and the figures that we're going to use? In other words, like on May 2nd, once that information is published, how can another provider, such as the claimants in this part of the appeal, verify that the calculation is acceptable and correct? In other words, how would they know that in this case Hendrick's data was incorrect or the correct data was not used? Is there enough there for them to have, at that time, objected? I would answer that, Your Honor, by saying there's no expectation that other hospitals, because remember, this data is used not just for this geographic area, but it affects the wage index for the entire country. So there's no expectation by the in there. There are ways, especially if you're all in the same geographic area, then you would likely have some idea of what the general wages are. What are the fringe benefits that are being offered? What are you paying contractors? So there's a generalized knowledge, but the secretary is not suggesting that each hospital, other than an individual hospital, is required to look at that data and know that there is something wrong. But where the secretary reasonably exercised her discretion is that the secretary put the burden on the hospital who would be in the best position to know whether that data was accurate. The burden is placed on the hospital who provides that data to not look at the country or not even look at the geographic area, but you know your data. You look at your data and you've been told that you're required to do that since the 1997 this procedure was adopted. I understand that as an argument insofar as Hendrick is concerned, that even if they did provide subsequently the correct data, they could look at the number and say, oh, well, you used the wrong data we previously submitted. You need to use the data that we then corrected and timely submitted. In this part of the appeal, as I understand it, there are providers who aren't privy to Hendrick's data. They just look at a number. I mean, how would they be on notice that, gee, this number is low because of a mistake made by the secretary or one of the contractors? They would not be on notice, Your Honor. They would not. But the secretary has to create a system. It has created a system that in our view best protects the rights of all of the hospitals by placing the burden on the individual hospitals to check their data. The secretary has created a system that provides protections for third-party hospitals. That's a reasonable exercise of the secretary's discretion. No, the hospitals cannot go in and see that there was a data in this system. But the system itself is designed to protect all parties by, again, placing the burden on the person who would know. Hendrick's would know that their data was incorrect. Hendrick's has been, according to their website, last checked about a week ago, they've been in business for 91 years. This process of checking your data and this understanding that you could not correct it if you did not meet the deadlines has been in process since 1997. The protections for other hospitals were put into this system in a way that the secretary could easily administer it, i.e. requiring the hospitals to make a final check. That is the protection for the third-party hospitals, not an expectation that they will look at those numbers and know that there's an error. You're saying basically that there's a community of hospitals that have to make certain that it's correct data is used primarily for its benefit, but for everybody else's as well. That's exactly right. And there are several cases that are cited in the brief where they note that it is in a hospital's own self-interest to make sure that its data is correct. That's noted in Southeastern Alabama Medical Center. It's noted also, I think, in the Bay State decision. The secretary realized, because keep in mind, although its wage index sounds so simple, it's a very complex system. They are collecting data from thousands of hospitals and thousands of points of data, what they're paying their employees, what they're paying the contractors, what fringe benefits are available. So the secretary is amassing a great deal of data. It had experience prior to 1997 where there were errors, and those errors prevented finality in the system. They could not create the perspective wage with any finality because people kept coming in saying there are errors here. So they created this system, and it is a reasonable system designed that takes into account all of the relevant factors and has created something that had Hendrick actually adhere to, the system, again, that had been in place since 1997, would have prevented this. But the fact that there is a harsh result in this case, and that Hendrick did not look, and that has adversely affected the Anson providers, the harsh result does not make the secretary's process arbitrary or capricious. The secretary relied on data that was in the public use file that had been made available for it. It was reasonable for the secretary, given its process, to rely on that data. What Anson argues is that, well, you had the right data, and you transmitted it incorrectly. But that very scenario was contemplated by the secretary. In all of the various millions of data points, there could be an error. That was understood, and the secretary created a system that would allow for those errors to be protected before they became fine. What is your best Fifth Circuit case for the proposition not that a provider cannot contest the data submitted by another hospital and its correctness, but rather, as in this case, the correct data was submitted by the secretary? You understand what I'm asking? What is your best case, Fifth Circuit case, that precludes a provider from contesting the secretary's actions in not using the correct data? I have no Fifth Circuit case for that proposition. The best I can do is refer to the Anna Jacks decision, where they talk about the fact that the system, as large as it is, does allow the secretary to sacrifice absolute precision. Say again, what decision did you? The Anna Jacks. Yes, okay. It's in the Bay State case, but that is a district court case. But there is a very detailed, and we feel In the Bay State case, the error was noted. The error in the numbers was noted before the final publication. That's different here. Here, we had already, the secretary had already finally published the wage index when the error was brought to the secretary's attention. But in the Bay State case, the error was brought to their attention prior to the final publication of the rule, and yet, as the court noted, failure to comply with the procedures in place to have objected to the numbers in a reasonable time frame precluded the relief. That is the case that we would ask the court to look for, and the decision there is the decision that we would ask this court to reach in this case. Those deadlines matter. Having a settled index, wage index, affects how hospitals, it affects how they hire, it affects how they do their business going forward. You had a 30-day time window that we talked about. I don't recall, but help me with this. At what mark did they miss the 30 days deadline? The wage index, the final wage index, was published in August. The communication about the error in the numbers began, I believe, in December, Your Honor, in December. So it was six months late? Yes. Yes, Your Honor. Again, the system, as it's created, was a reasonable exercise of the secretary's discretion. It is an iterative system. It provides several opportunities for errors to be noticed. And for errors to be corrected, to ensure finality when that final wage was published. That system cannot, a system is also not created to allow third parties to come in and challenge the data. In this case, we have a small group of hospitals that are challenging the data. And what they would say is that this is a small issue, and it's very limited, and we should be making this challenge because there was an error that the hospital did not correct. But, quite honestly, any hospital in the nation, if the court is to allow third parties to come in and challenge a final rate because a single hospital did not take advantage of the opportunity to review and correct the data? If you're a hospital, you're just subject to the weakest link in the chain. I would disagree, Your Honor. I would say that the strongest link is a hospital who is dependent on those numbers being accurate. I understand that, but what I'm saying is that you have five hospitals out there and one fails to note the errors in the data it's involved with, and the consequences of this is upon everybody. That is accurate, Your Honor. But that does not make the system The kicker misses the field goal, the whole team loses. Yes. Yes, that is correct. But, again, as I noted earlier, the result And that's true even though the error is not made by any of the hospitals. Any of the hospitals, the error is made by the government contractor. Yes, Your Honor, because it is the system itself that's at issue. And although the Anson providers argue that we're not seeking to correct the Hendricks data, that's exactly what they're doing. The data was put out in the May files for Hendrick to correct to review the data and correct it if it needed to be corrected. Hendrick did not do that. And so the secretary relied on the data in that file but had not been challenged. Now the providers are coming in saying, no, you should use the data that Hendrick should, in fact, had corrected in those files. Every provider has got to be, there's no way the providers can protect themselves from another, somebody else's failure. Have you checked your data? It's the whole system. Yes, Your Honor, that is true. But, for example, if the secretary reaches out to a hospital because of errors in that hospital's data, and the hospital does not respond, then what the secretary does in that situation is it reaches out to the hospital association for that. I understand that argument. What you have here, though, is that you do have this further, one step further away, one step removed from the individual providers. So you're a hospital out there, it's not only, you've got to keep up with the data that other hospitals have produced, you can't really do that. It's that you're vulnerable to that. Not only that, you're vulnerable to that, but the way you can know about it, if your own contractor, CMS's own contractor screws it up. So I understand the equity among the team and the hospitals, it is a community of interest, et cetera, but the error is not made by a member of the community, it was made by the government, and it's vested on the community. But the justification is that it's part of the system. The justification is not merely that it's part of the system. The justification is that the system cannot work if there's not some finality. I understand that very well. I understand that. I'm sorry, I don't mean to be repetitive. But with respect to, yeah, I was asked what case out there would we rely upon, and I would look to the Anajax decision, but with respect to courts finding that the precision. You rely on Anajax to support the process, right? To support the process. Yes, Your Honor. In no system of this size and this scale and this many errors will there not be on occasion a harsh result. I think that's true even in court when we have deadlines and statutes of limitations, and sometimes those deadlines and statute of limitations lead to harsh results. You know, if you don't come to the court within a certain amount of time, if you don't conduct the discovery in a case that you feel is necessary, but you don't meet the deadlines of the district court judge, you don't get that information. The deadlines are important, and they can, the Secretary, in its discretion, can allow an error of this magnitude to stand because the system it's created was reasonable. What's the total loss to the entire community, the providers, everybody here? The total loss has not been calculated by the Secretary. The providers have thrown out numbers in the 650, 700 range. Hendricks has thrown out a number of about $2 million. The Secretary has not calculated those numbers. Is it $2 million for the entire system or for? That is for Hendricks. The number they were throwing out, was that the entire system? Well, it was, I think the total number, Your Honor, and I'm going to ask for a bit of latitude in this because I'm not certain. I think the total number is somewhere in the 2.5 to 2.75 million for the entire Abilene geographic area. This is a very, very small fraction of the monies that you're administering, a very, very small fraction. Yes, it is, Your Honor. I'll tell you, why doesn't the system work beautifully and evenly to correct this level of error, adjusting these even? Looking at it in terms of the, as the Secretary must, on a national basis, to a system that works a million here and a million there, it just is really nothing. These are minute adjustments that could evenly be made without frustration of the system. I understand your argument about the system. It makes perfect sense to me. The qualification of that that I have difficulty with is that the level of error here sounds loud in terms of millions of dollars, but in terms of the consequences of administering this system, it is directly nothing. We know that. Yes, Your Honor, and that is, if this Court allows— Yes, if this Court allows— I understand. Yes, it will completely destroy all finality, because it's not just this hospital. It's every hospital that wants to come in and challenge the wage index or perhaps challenge the information that another hospital has provided. This has nationwide implications. Your argument is we hear today that the Board didn't hear below. That is correct. The Board did not. All right. There are no further questions. All right. Thank you, ma'am. All right, Mr. Roth, last words. It's been a long morning. Thank you for your attention, Your Honor, and the entire panel. I'll be very brief here. What we just heard the Secretary's counsel talk about is the potential ripple effect if this challenge is allowed to go forward. But, of course, as we explained, the ripple effect here would be insignificant, because I've never heard of another case where the Secretary's agent made an error that the Secretary wouldn't correct. So I think that, from our perspective, the dangerous ripple effect is the other way around, that Secretary will then be emboldened that more and more errors can be made by its unilateral negligence. You don't argue. We don't have the specifics of your case before us. We have the determination of exhaustion, jurisdiction, etc. I mean, that's the issue we have, not correcting. We're not error correcting. So we're not correcting the 2 million. I mean, the issue before us was the exhaustion, jurisdictional, legal issues. And so they argue that, you know, as I asked you in the other piece, we reversed. It's not a matter of saying, well, we think it's unfair you didn't get the 2 million. It's saying the agency or the system is legally infirm under the statute for operating the way it did. That's the way I'm hearing it. I don't hear you. You've ably made the case in terms of the 2 million shortage. Got that. But the same arguments you're making to us, or the arguments that were made to the board below, etc., etc., in terms of the whole process. So you say case of first impression. Yeah, it would be. But to reverse and say the whole statutory scheme. No. The Hendrick case certainly involved exhaustion in jurisdiction, but Anson doesn't. There's no question about exhaustion, no question about jurisdiction. We're properly before the is the unilateral MAC error, and that we believe that this court should hold the secretary accountable for the errors by his contractor. Anna Jackson. We cite to us an instance where the secretary, the current one or some prior one in the umpteen years this has been in place, has overridden a board determination and under the powers of the there's an inequity here. So in my prerogatives of secretary, I'm going to give the 2 million, so to speak. That's what happened in Palisades. We got the money because the secretary tried to prevent us from going to court and then refused to defend that decision after Judge Kessler supported the secretary, the provider reimbursement review board, on that jurisdictional decision. Anna Jackson, as we talked about, does not address the wage correction process. So that's not applicable here. So she doesn't cite it for that proposition. She cites it for the total proposition of how this process works, the apparatus, the fitness, the court, the D.C. Circuit, the District Court, which found, yes, there are going to be errors, yeah, yeah, yeah, yeah. So they said the government stands on Anna Jackson from a process standpoint, not from the finer points here. And I hadn't heard you push back on that. Oh, no, I agree entirely. And in Anna Jackson, the distinguishing factors that did involve the wage data correction process, that challenged to a challenge to the very way the secretary determines wage areas, which is something that, quite frankly, goes to the matter of what the secretary actually has to do with the wage index, as opposed to here where we have a contractor error. So, but thank you for your attention. If the Court has no further questions, I just thank you for your attention today. All right. Thank you, Mr. Roth. You're doing double duty here. It's an interesting